

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1521-11

**MATTHEW JOHN CASANOVA, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON STATE'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE EIGHTH COURT OF APPEALS
## ORANGE COUNTY

PRICE, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, KEASLER, HERVEY, COCHRAN and ALCALA, JJ., joined. WOMACK, J., concurred in the result. JOHNSON, J., dissented.

## O P I N I O N

The appellant was convicted pursuant to an indictment charging him with the offense

of possession of cocaine in an amount less than one gram, a state-jail felony, and the jury

assessed his punishment at one year's confinement.[1] On appeal, he argued that the trial court

---

[1] TEX. HEALTH & SAFETY CODE § 481.115(a) & (b); TEX. PENAL CODE § 12.35(a).

erred in failing to submit a jury instruction under Article 38.14 of the Texas Code of Criminal Procedure, which requires the jury to find that the testimony of the accomplice witness was corroborated before it could rely on that testimony for a conviction.[2] Although the appellant did not object in the trial court to the absence of such an instruction, he argued on appeal that his conviction should nevertheless be overturned because, under *Almanza v. State*,[3] he suffered egregious harm from the defective jury charge that lacked an accomplice witness instruction.[4] The appellant also argued, alternatively, that he should be acquitted because the evidence was legally insufficient to corroborate the testimony of the accomplice witness.

In an unpublished opinion, the Eighth Court of Appeals reversed the appellant's conviction.[5] The court of appeals agreed with the appellant that the lack of an accomplice-witness instruction egregiously harmed him.[6] Additionally, the court of appeals *sua sponte* noted that the trial court had neglected to read the jury charge out loud to the jury as required

---

[2] *See* TEX. CODE CRIM. PROC. art. 38.14 ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.").

[3] 686 S.W.2d 157 (Tex. Crim. App. 1985) (opinion on reh'g).

[4] *Saunders v. State*, 817 S.W.2d 688 (Tex. Crim. App. 1991).

[5] *Casanova v. State*, No. 08-10-00006-CR, 2011 WL 3849453 (Tex. App.—El Paso, delivered Aug. 31, 2011) (not designated for publication).

[6] *Id*. at *5.

by Articles 36.14 and 36.16 of the Code of Criminal Procedure.[7]  Although the appellant

neither objected to this second deficiency at trial, nor even raised it as a point of error on

appeal, the court of appeals recognized it as jury-charge error that is also subject to *Almanza*

analysis and found it also to be egregiously harmful.[8]

The court of appeals failed to reach the appellant's legal sufficiency claim—even

though, if successful, such a claim would result in his acquittal.[9]  We granted the State's

petition for discretionary review in order to examine the court of appeals's finding of

egregious harm with respect to the two jury charge errors.  We now reverse the judgment of

the court of appeals.

## I.  ACCOMPLICE-WITNESS INSTRUCTION

### A.  The Legal Standard

The appellant's wife, Esther Garza, was the State's principal witness against him at

his trial.  By the time she testified against him, she herself had been indicted—indeed, she

had pled guilty, been convicted, and was awaiting a probated sentence—for possession of

---

[7] *Id*.  *See* TEX. CODE CRIM. PROC. arts. 36.14 & 36.16.

[8] *Id*. at *7 (finding "that the trial court's errors singularly and cumulatively resulted in egregious harm to" the appellant).

[9] *See Ex parte Reynolds*, 588 S.W.2d 900, 902 (Tex. Crim. App.1979) (lack of evidence to corroborate accomplice testimony results in an acquittal, with federal double jeopardy consequences). *Cf*. TEX. CODE CRIM. PROC. art. 38.17 (when corroboration of a witness is "required to authorize a conviction, if the requirement be not fulfilled, the court shall instruct the jury to render a verdict of acquittal, and they are bound by the instruction").

the identical cocaine that the appellant was on trial for possessing. She was therefore an accomplice as a matter of law, and it was error for the trial court to fail to submit an accomplice-witness instruction to the jury.[10] The only question is one of harm. Because the appellant did not object to the error at trial, reversal follows only in the event that the record demonstrates that the error resulted in egregious harm.[11]

In *Saunders v. State*,[12] we articulated a standard for determining egregious harm under *Almanza* in the context of the failure to submit an accomplice-witness instruction:

> [I]f the omission is not made known to the trial judge in time to correct his error, appellate review must inquire whether the jurors would have found the corroborating evidence so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.[13]

We reiterated this standard for egregious harm in *Herron v. State*.[14] In the instant case, the court of appeals cited to both *Saunders* and *Herron* in its opinion, but only in support of

---

[10] "When the evidence clearly shows (i.e., there is no doubt) that a witness is an accomplice as a matter of law, the trial judge must instruct the jury accordingly. * * * A witness who is indicted for the same offense or a lesser-included offense as the accused is an accomplice as a matter of law." *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011).

[11] *Almanza, supra*, at 171. It is to be remembered that "burdens of proof or persuasion have no place in a harm analysis conducted under *Almanza*." *Warner v. State*, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008).

[12] 817 S.W.2d 688 (Tex. Crim. App. 1991).

[13] *Id*. at 692.

[14] 86 S.W.3d 621, 632 (Tex. Crim. App. 2002).

incidental propositions of law. Nevertheless, the court of appeals ultimately concluded that the error was egregiously harmful, at least in part, because "rational jurors would have found the State's case for conviction clearly and significantly less persuasive had they been properly instructed[.]"[15] Thus, the court of appeals invoked the *Saunders/Herron* standard.

In reaching its conclusion under the appropriate standard, the court of appeals nevertheless alluded to several cases that involve the discrete issue of the *sufficiency* of non-accomplice testimony to corroborate.[16] In the sufficiency context, we have said that, "when there are two permissible views of the evidence (one tending to connect the defendant to the offense and the other not tending to connect the defendant to the offense), appellate courts should defer to that view of the evidence chosen by the fact-finder."[17] Seizing upon this language, the State now argues that the court of appeals erred in finding egregious harm in this cause without deferring to the view of the fact-finder, in light of evidence in the record that the State contends could permissibly be viewed both as tending to connect the appellant to possession of the cocaine and *not* tending to connect him to it. We disagree. Because no

---

[15] *Casanova*, *supra*, at *5.

[16] Prominent in the court of appeals discussion of the egregious harm issue are citations to our opinions in *Smith v. State*, *supra*, at 442-48, and *Simmons v. State*, 282 S.W.3d 504 (Tex. Crim. App. 2009). *Casanova*, *supra*, at *3, *5. Each of these cases addresses the issue of whether non-accomplice evidence was sufficient to "tend to connect" the defendant to the offense for purposes of Article 38.14. Neither case involved the question of whether failure to give an Article 38.14 instruction in the first instance, when no objection was made, was egregiously harmful.

[17] *Simmons*, *supra*, at 508.

accomplice-witness instruction was submitted to the jury in this cause, there is no fact-finder's view to which an appellate court can defer for purposes of assessing egregious harm, *vel non*. That non-accomplice evidence may be, at a bare minimum, sufficient to support a finding that the accomplice witness's testimony was corroborated, when viewed in the light most favorable to the jury's verdict, does not dispose of the question of egregious harm.[18] Instead, the reviewing court must take the entire record into account, as in any *Almanza* analysis,[19] to assess whether the jury, had it been properly instructed on the law requiring corroboration of accomplice-witness testimony, "would have found the corroborating evidence so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive."[20] We begin with a synopsis of the evidence relevant to the appellant's guilt independent of the accomplice witness's testimony.

### B.  The Non-Accomplice Evidence

The jury was authorized to find the appellant guilty either as a principal actor or as a

---

[18]

*Cf. Scott v. State*, 227 S.W.3d 670, 694 (Tex. Crim. App. 2007) ("[A] constitutional harm analysis does not turn on whether, discounting the erroneously admitted evidence, the remaining evidence was legally sufficient to convict."); *Satterwhite v. Texas*, 486 U.S. 249, 258-59 (1988) ("The question . . . is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State has proved beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (internal quotation marks omitted)).

[19]

686 S.W.2d at 171 ("[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.").

[20]

*Saunders*, *supra*, at 692;  *Herron*, *supra*, at 632.

party to possession of the cocaine, which was found in Garza's purse. To find the appellant guilty as a party, the jury would have to be able to find that, "acting with intent to promote or assist" Garza's possession of the cocaine found in her purse, he "solicit[ed], encourag[ed], direct[ed], aid[ed], or attempt[ed] to aid" Garza in that possession.[21] Before the jury could rationally convict the appellant either as a principal *or* as a party, it would have had to be able to find, at a bare minimum, that he was *aware* that Garza possessed the cocaine in her purse. After all, he can neither personally possess, nor facilitate the possession by another, of drugs that he does not know to exist. We look to the non-accomplice evidence, therefore, with an eye to determining whether it tends to establish that the appellant was aware that there were drugs in Garza's purse. Discounting Garza's own accomplice testimony that directly established the appellant's complicity, the remaining evidence unfolded as follows.

Chris Hartman was a patrol officer with the Vidor Police Department on the evening of January 3, 2007, when he was called to the La Quinta Inn at about 9 p.m. on an indecent exposure complaint. Contacting the desk clerk about the call, Hartman was directed to a Hispanic male, the appellant, leaning against a pillar and smoking a cigarette right outside the front door. Hartman formed an immediate impression that the appellant was "on some

---

[21] TEX. PENAL CODE § 7.02(a)(2). The jury was authorized to find the appellant guilty if, "acting alone or as a party as that term has been previously defined" in the jury charge, he possessed the cocaine. The definition previously given listed every act included in Section 7.02(a)(2) capable of triggering party liability, namely, soliciting, encouraging, directing, aiding, or attempting to aid the commission of the offense. The jury was not authorized to find the appellant guilty as a party under Section 7.02(b)'s conspiracy theory of party liability. TEX. PENAL CODE § 7.02(b).

kind of drug or alcohol." The appellant's pupils "were really constricted[,]" and he was "paranoid[,]" claiming that "someone was trying to kill him." When Hartman asked the appellant whether he had "been taking any drugs or any kind of medication[,]" the appellant replied that "he'd been smoking crack and smoking pot." Concerned that the appellant might constitute a danger to himself or to the public, Hartman asked whether there was a responsible adult into whose custody he could commit the appellant as an alternative to arresting him for public intoxication.[22] The appellant told Hartman that his wife was in their room upstairs and escorted Hartman there.

The appellant knocked on the door, and when Garza opened it, the appellant invited Hartman inside and introduced Garza as his wife. Garza immediately went over to the bed and sat down with her back against a pillow. Hartman asked the appellant for identification, and the appellant informed him that his ID was in Garza's purse. When Hartman asked Garza to confirm that she had the appellant's ID in her purse, she denied that she even had a purse. At this point, the appellant "started telling on her[,] saying, 'No, she does have a purse. It's hiding behind her back underneath the pillow.'" Alarmed by this turn of events and concerned for his safety, Hartman asked Garza to stand up and inquired whether she had a purse under the pillow. Garza admitted that she did. Hartman searched the purse and found both marijuana and rock cocaine, but he did not find either the appellant's or Garza's

---

[22]

*See* TEX. PENAL CODE § 49.02(a) & (c) ("A person commits [a Class C misdemeanor] offense if the person appears in a public place while intoxicated to the degree that the person may endanger the person or another.").

ID. The appellant was subsequently able to locate Garza's ID "[k]ind of up against the wall against the television set." Hartman then conducted a warrants check and discovered that the appellant had an outstanding arrest warrant arising from a burglary charge in another county. He arrested both Garza and the appellant—Garza, for possession of the illicit drugs found in her purse, and the appellant, based on the outstanding warrant. Once the appellant was handcuffed, he told Hartman that Garza had stolen the Ford Focus that they were driving from a dealership, "that she had test drove it and never returned it."

When backup officers arrived, the officers took the appellant and Garza downstairs and placed them in Hartman's squad car and then set out to verify the appellant's claim that the Focus had been stolen and to inventory its contents. The appellant became increasingly paranoid and agitated, continuing to claim that "they're going to kill me, they're going to kill me." He and Garza were eventually separated, and Hartman had to pepper spray the appellant before he would calm down. On the way to the Orange County Jail, the appellant vomited several times in the back of Hartman's squad car and had to be diverted to the hospital emergency room for precautionary treatment. By this time, Hartman maintained, the appellant "was out of his mind paranoid."

On cross-examination, Hartman admitted that he had encountered "people who might be experiencing some kind of mental episode in their life" that could trigger paranoia. He conceded that he had failed to detect the distinctive odors of burning marijuana or crack cocaine when he entered Room 213. Nor did he discover a crack pipe in the room. He also

acknowledged that "it was only after [the appellant's] insistence that [Garza] was sitting on it that [Hartman] ended up getting into that purse." He did not originally arrest the appellant for possession of the drugs in Garza's purse, but only added that charge later.

Garza testified after Hartman,[23] and then the State rested its case-in-chief. The defense called the appellant as its only witness. The appellant testified that he and Garza had been "fighting" when they checked into their room at the La Quinta. Garza went into the bathroom, apparently to take a shower, and the appellant waited on the bed in his boxer shorts to shower after her. The appellant had been feeling paranoid and fearing for his life, and Garza was fueling his fear. When Garza emerged from the bathroom, she had tears in her eyes, and she told the appellant, "This is going to hurt me more than it's going to hurt you." A scuffle of some sort ensued during which the appellant apparently flashed before

---

[23] The court of appeals accurately summarized Garza's testimony:

> Accomplice-witness Garza's testimony established that she and Appellant had purchased cocaine earlier in the day after cashing her paycheck, that they had smoked cocaine during the day and in the hotel room using Appellant's cocaine pipe, and that Appellant was aware that cocaine was in the hotel room on the dresser. When Officer Hartman requested that Garza open the door, Garza stated that she stuffed the crack cocaine in her purse and hid it behind her back because she knew she had "the stuff" in her purse when Appellant asked her for his identification, and that is why she told Appellant in the officer's presence that Appellant had taken his wallet with him. Although admitting that she was guessing, Garza stated that Appellant knew that she puts everything in her purse, that her purse had been on the desk, and that neither her purse nor the crack were on the dresser any longer. She testified that Appellant did not see her put the crack inside her purse because he wasn't in the room at the time.

*Casanova*, *supra*, at *4.

the window in a state of undress. He managed to put his clothes on and fled the room. He crossed the street to a fast-food restaurant where he called 9-1-1 to summon the police, telling the 9-1-1dispatcher that he "feared for [his] life."

The appellant admitted that, when Hartman approached the appellant outside the La Quinta lobby, he told Hartman that he had been drinking all day, just as he drinks every day. But he denied that he had smoked any crack cocaine that day, and he emphatically denied telling Hartman that he had smoked either crack or marijuana. He suggested, if somewhat obliquely, that he had observed Garza smoking marijuana and what he thought was "ice" at some point earlier in the day and that she might have been smoking cocaine in the bathroom of their hotel room. But he denied ever having handled the drugs himself.[24] He explained

---

[24] Speaking of the day of the appellant's arrest, defense counsel inquired:

Q  Had you seen [Garza] – you've seen her do some weed, did you do any weed that day?

A  No, I don't smoke no weed.

Q  Did you observe her doing any crack?

A  To tell you the truth, honestly, I thought she was smoking ice not crack.

Q  Did you smoke any of it?

A  No.

Q  Did you ever handle the drugs?

A  No. I didn't never even knew that – I mean, I couldn't even tell you – I didn't even know it was packaged. To my surprise I didn't know she admitted to putting it in a plastic wrapper. You see I didn't – all of that was new to me because I

that he had been "diagnosed with traumatic depression, post traumatic stress, bi-polar two," and some other disorder he had never heard of, and that he had been prescribed six medications to treat these various disorders, including "Celexa" and "Depakot."[25] But, the appellant maintained, because he knew it is dangerous to take these medications with alcohol, he had quit taking them, and this was what had caused the paranoia and constricted pupils that Hartman observed that evening.[26] The appellant claimed to have told Hartman, in response to Hartman's question whether he had been taking drugs or medication that day, "I

had no idea.

Q So you get to the hotel room, and did she ever smoke any weed in the room?

A No, sir.

Q Did she ever smoke any crack in the room?

A She was in the restroom. She was in the restroom and I thought she was going to take a shower but she never came out like any sign of a shower.

[25] The defense offered no further evidence to describe the symptoms of these various disorders or the effects of the medications prescribed to treat them.

[26] The prosecutor asked:

Q [Y]ou'd been smoking crack all day and you were high on crack; isn't that right?

A I don't remember smoking crack.

Q But the reason why you were paranoid and not making sense and your eyes were glassy and your pupils were constricted is because you'd been smoking crack all day; isn't that true.

A No, because I didn't have my medication.

do take drugs, my pills." Asked on cross-examination whether Hartman had simply "made up" his assertion that the appellant admitted smoking crack and marijuana, the appellant explained:

> I'm not saying he made it up, I'm assuming that when he found the drugs [in Garza's purse] he put that – he didn't know about my medical condition so he automatically being a professional he assumed that the drugs were in my possession so he figured that we had probably been smoking.

Up in the room, when Hartman asked to see the appellant's ID, the appellant could not find it in his wallet, so he decided that Garza "had to have it" in her purse. He insisted that, had he known that there was marijuana and crack cocaine in Garza's purse, he would never have prompted Hartman to look for it under the pillow. When the prosecutor asked the appellant whether his escalating paranoia in the police car and en route to the jail was a product of his "self-medicating with alcohol and crack cocaine and whatever else[,]" he replied, "Alcohol it's true, but not crack cocaine."

### C. Tends to Connect?

The court of appeals, although it did not directly resolve the appellant's legal sufficiency claim, nevertheless observed in the course of its egregious harm analysis that the non-accomplice evidence "was extremely weak and failed to tend to connect [the a]ppellant to the offense of possession of cocaine[.]"[27] Of course, if it is indeed accurate to say that the corroborating evidence was so weak that it did not even *tend* to connect the appellant to the

---

[27] *Casanova*, *supra*, at *5.

cocaine in Garza's purse, then it would ineluctably follow that a rational jury would "have found the corroborating evidence so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive."[28] But it would also necessarily mean that the appellant's legal sufficiency claim should have been sustained and that the court of appeals should have ordered the entry of a judgment of acquittal.[29] We decline to take that action today, however, because we disagree with the court of appeals's conclusion that the evidence altogether failed to tend to connect the appellant to the cocaine.

We believe that the court of appeals was mistaken to characterize the non-accomplice evidence, as summarized above, as having no tendency to connect the appellant to possession of the cocaine found in Garza's purse. We have long held that corroborative evidence need not be legally sufficient in itself to establish a defendant's guilt.[30] Here, the corroborative evidence shows that the cocaine was found in the hotel room that the appellant was sharing with his wife, Garza. The appellant appeared to Hartman to be under the influence of "some kind of drug or alcohol[,]" and, if Hartman's account is to be believed, the appellant admitted

---

[28]

*Saunders*, *supra*, at 692. Had the State simply presented Garza's testimony, and nothing more, the lack of an accomplice-witness-as-a-matter-of-law instruction would clearly have caused the appellant egregious harm, since a properly instructed jury would have had no competent evidence before it upon which to convict. If the evidence other than Garza's testimony truly had *no* tendency to connect the appellant to the offense, the result would necessarily be the same—egregious harm.

[29]

*See* note 9, *ante*.

[30]

*E.g.*, *Brown v. State*, 561 S.W.2d 484, 487 (Tex. Crim. App. 1978).

to having smoked crack cocaine earlier that day. The appellant's paranoia appeared to be escalating over the course of the evening, suggesting that he may have "been smoking crack" at a point in time relatively close to Hartman's first encounter with him. The appellant himself conceded that he was aware that Garza was ingesting drugs earlier in the day and may have been smoking crack cocaine in the bathroom of the hotel. While this evidence may not suffice, by itself, to convict the appellant for possession of the cocaine found in Garza's purse, surely it at least *tends* to connect the appellant—as a party to Garza's possession, if not as a principal actor.

This is not to say, of course, that there is no evidence in the record that also tends to refute the inference that the appellant was aware of the cocaine in Garza's purse—as we shall examine below in our egregious harm analysis under *Almanza/Saunders/Herron*. But that does not translate into a conclusion that there was no evidence that a rational trier of fact could conclude tended to connect the appellant to the offense for purposes of Article 38.14's corroboration requirement. Because the appellant does not argue in his petition for discretionary review that the court of appeals erred in failing to reach his legal sufficiency claim and enter a judgment acquitting him, and because we conclude in any event that the evidence was legally sufficient to tend to connect the appellant to the offense, we have no occasion to remand the cause to the court of appeals for a legal sufficiency analysis.

As we have already noted, however, that does not necessarily dispose of the egregious harm issue. The corroborating evidence, though legally sufficient, may yet prove in a given

case to be so insubstantial or "unconvincing" as to render the lack of an accomplice-witness corroboration instruction egregiously harmful.[31] We turn to that inquiry next.

### D. So Unconvincing as to Render the State's Case Significantly Less Persuasive?

Whether error in failing to submit an accomplice-witness instruction will be deemed harmful is, we have said, a function of the strength of the corroborating evidence.[32] The strength of that evidence is, in turn, a function of (1) its reliability or believability and (2) how compellingly it tends to connect the accused to the charged offense.[33] Corroborating evidence that is exceedingly weak—that is to say, evidence that, while it is legally sufficient to tend to connect, is nevertheless inherently unreliable, unbelievable, or dependent upon inferences from evidentiary fact to ultimate fact that a jury might readily reject—may call for a conclusion that the failure to give the accomplice-witness instruction resulted in harm regardless of whether the deficiency was objected to.[34] Corroborating evidence this weak

---

[31] *Saunders*, *supra*, at 692.

[32] *See Herron*, *supra*, at 632 ("The difference in harm standards impacts how strong the non-accomplice evidence must be for the error in omitting an accomplice witness instruction to be considered harmless.").

[33] *See Id*. ("In determining the strength of a particular item of non-accomplice evidence, we examine (1) its reliability or believability and (2) the strength of its tendency to connect the defendant to the crime.").

[34] *See Saunders*, *supra*, at 693 (when inferences to be drawn from State's corroborating evidence were not particularly "well supported by [that] evidence" and, moreover, were contradicted by defensive evidence that contradicted those inferences, "rational jurors would certainly have found the

may thus result in both egregious harm and some harm.[35]   As the strength of the corroborating evidence increases, however, a reviewing court may no longer be able to declare that the lack of an accomplice-witness instruction resulted in egregious harm, but it may still conclude that the deficiency resulted in some harm and reverse the conviction if there was a trial objection.[36]  And as the corroborating evidence gains in strength to the point that it becomes implausible that a jury would fail to find that it tends to connect the accused to the commission of the charged offense, then a reviewing court may safely conclude that the only resultant harm is purely theoretical and that there is no occasion to reverse the conviction, even in the face of an objection, since the jury would almost certainly have found that the accomplice witness's testimony was corroborated had it been properly instructed that it must do so in order to convict.[37]

As we have explained, the evidence tending to connect the appellant to the drugs in

State's case significantly less persuasive had they been told that [the accomplice witness's] testimony could not be accepted without corroboration").

[35]    A record that demonstrates that jury charge error resulted in egregious harm will, *a fortiori*, also demonstrate that the error resulted in at least some harm.

[36]    *See Herron*, *supra*, at 633 (discussing *Burns v. State*, 703 S.W.2d 649 (Tex. Crim. App. 1985), in which some harm was found because the only corroborating evidence consisted of the defendant's confession, but the jury could have found the confession involuntary and was instructed to disregard it in that event, in which case there would have been no corroborating evidence).

[37]    See *id*. (discussing *Medina v. State*, 7 S.W.3d 633 (Tex. Crim. App. 1999), in which the Court found only theoretical harm, not some harm, because "there was a substantial amount of non-accomplice evidence" and there was "no rational and articulable basis for disregarding the non-accomplice evidence or finding that it fails to connect the defendant to the offense").

Garza's purse was far from insubstantial. Hartman's testimony was not inherently incredible, and it tended to show that the appellant would have at least been aware that Garza had cocaine in her possession in their shared hotel room. But it also did not go wholly unchallenged. The appellant denied telling Hartman that he had smoked marijuana and crack cocaine earlier in the day. And it was clearly against the appellant's self-interest to have insisted to Hartman that Garza was hiding her purse behind the pillow if he actually knew that she had cocaine concealed in it. These facts might have caused the jury to question the credibility of the non-accomplice evidence—enough, perhaps, to establish that the appellant suffered at least some harm from the absence of an accomplice-witness instruction. Even so, however, we do not think that this likelihood is great enough to say that egregious harm is evident on the record.

This case is quite unlike *Saunders*, in which we found egregious harm. In *Saunders*, we observed that the inculpatory inferences deriving from the State's corroborative evidence were tenuous to begin with. Moreover, Saunders presented plausible defensive evidence that cast all of the State's corroborating evidence in a light that convincingly undermined every inculpating inference. Here, by contrast, the inferences to be drawn from the State's corroborating evidence more than sufficiently tend to connect the appellant to Garza's possession of the cocaine, and in order for the jury to have discounted that tendency, it would have had to accept the appellant's less-than-creditable explanations. For example, the appellant's surmise that Hartman simply mistook his statement that he takes "pills" for his

various mental disorders for an assertion that he had been smoking marijuana and cocaine earlier in the day defies plausibility. The jury would have had to conclude that Hartman was simply lying about the content of the appellant's statement; yet the record presents no compelling reason for them to believe that he was. We think the likelihood that the jury would have accepted the appellant's exculpatory evidence is too remote to justify a conclusion that the corroborating evidence presented by the State was "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." Accordingly, we conclude that the court of appeals erred to hold that the appellant suffered egregious harm from the absence of an accomplice-witness instruction.

### III. READING THE COURT'S CHARGE ALOUD

The court of appeals concluded that egregious harm also occurred when the trial court failed to read the guilt-phase jury charge aloud before sending the jury back to deliberate, as required by Articles 36.14 and 36.16 of the Code of Criminal Procedure.[38] There is no question that, in instructing the jury to retire to the jury room, elect a presiding juror, and then have that presiding juror for the first time "read the charge out loud in the jury room[,]" the

---

[38] *See* TEX. CODE CRIM. PROC. art. 36.14 (trial court "shall . . . deliver to the jury" a charge "distinctly setting forth the law applicable to the case;" and "[b]efore said charge *is read to the jury*," trial court must give the parties an opportunity to present any objections thereto) (emphasis added); TEX. CODE CRIM. PROC. art. 36.16 (after objections to the charge are made by the parties, "the judge shall read his charge to the jury as finally written").

trial court violated the requirements of the statutory scheme.[39] The only question is whether the court of appeals was correct to conclude, *sua sponte*, that this error caused the appellant egregious harm as contemplated by Article 36.19 of the Code of Criminal Procedure.[40]

The court of appeals acknowledged that, *sans* a trial objection, "[a] judge's failure to read a jury charge will not be reversed absent a finding that the defendant was deprived of a fair and impartial trial."[41] Among the cases the court of appeals cited for this proposition

---

[39] The trial court instructed the jury:

I'm going to give you two oral instructions. I could read you this whole charge out loud. I've found that's not real productive to just [sit] there and have me read all these pages. So what I'm going to instruct you [is] this: When you go back to begin your deliberations the first thing you need to do is elect a presiding juror. The second thing you need to do is the presiding juror, or a volunteer, will need to read the charge out loud in the jury room. You may think, "Well, what's the difference, you read [it] out loud or we read it out loud." Well, back there you're going to be a lot more comfortable telling the reader, "Hey, slow down. Your mouth's moving faster than my ears are." Or [if] somebody coughs or moves a chair, you can say, "Hey, will you stop and start that paragraph over so I don't lose that part." It's just a lot more comfortable environment. Elect a presiding juror, the presiding juror or a volunteer reads the entire charge out loud and then and only then will you begin your deliberations.

[40] *See* TEX. CODE CRIM. PROC. art. 36.19 ("Whenever it appears by the record in any criminal action upon appeal that any requirement of Articles 36.14 . . . [and] 36.16 . . . has been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial."). The court of appeals did not err to analyze this issue under Article 36.19, as construed by *Almanza*. Moreover, the court of appeals was free to address the issue as one of unassigned fundamental error. *Sanchez v. State*, 209 S.W.3d 117, 121 (Tex. Crim. App. 2006). "Of course, absent a trial objection, the court of appeals was not free to reverse the conviction on the basis of jury-charge error absent a finding of the requisite egregious harm." *Id*.

[41] *Casanova*, *supra*, at *5.

was this Court's 1957 opinion on rehearing in *Quinn v. State*.[42]  *Quinn* is a case very close

on point in which we found there to be *no* harm.  There, the trial court "instructed the jury

that 'here was the charge of the court and that they could read the same when they retired for

their deliberations' but . . . he 'failed and refused' to read it to them."[43]  Nor did Quinn's trial

counsel "at any time request[ ] that it be read."[44]  Pointing to then-Article 666 of the 1925

Code of Criminal Procedure, which was the direct predecessor to, and is in all things

materially identical to, current Article 36.19, this Court observed that "a disregard of the

statute [requiring the trial court to read the jury charge aloud] *plus* injury must be shown in

order to bring about a reversal of the conviction."[45]  We reasoned that, "[c]learly, the

appellant could have shown injury by proving at the hearing on his motion for new trial, for

example, that the jury did not in fact read the charge after they had retired."[46]

But for two intervening legal developments, we would regard *Quinn* as clearly

controlling the question of egregious harm in this case.  First, we have clarified in recent

years that neither an appellant nor the State has a burden of proof or persuasion when it

---

[42]

 297 S.W.2d 157 (1957) (opinion on reh'g).

[43]

 *Id*. at 159.

[44]

 *Id*.

[45]

 *Id*.

[46]

 *Id*.

comes to an analysis for harm under Article 36.19, as construed by *Almanza*.[47] To the extent that our analysis in *Quinn* might suggest that it was the appellant's burden to prove injury, therefore, it is no longer controlling. Second, and more critically, since our opinion in *Quinn*, the consolidated Texas Rules of Evidence have gone into effect, including Rule 606(b), which restricts the admissibility of evidence from jurors themselves, during any post-verdict proceedings, that impugns the validity of their verdict.[48] Thus, it is less certain today that the appellate record can be made "clear" whether the jury actually followed the trial court's instructions to have the presiding juror read the jury charge aloud in the jury room.[49]

The court of appeals regarded the error as egregiously harmful because, "[b]ased upon the record before us, we cannot find that the jury was ever properly instructed regarding the proper application of the applicable law to the facts of the case regarding" the appellant.[50]

---

[47] *Warner*, *supra*, at 464.

[48] *See* TEX. R. EVID. 606(b) ("Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes.").

[49] *See People v. Marquez*, 963 F.2d 1311, 1315-16 (9th Cir. 1992) (failure of trial court to read critical portions of jury charge aloud defied harm analysis because the defendant "was precluded by [Federal Rule 606(b)] protecting a jury's decisional process from interviewing the jurors to show that one or more of them failed to read the written instructions[,]" and this circumstance rendered the failure to read the instructions aloud a "structural defect," compelling an automatic reversal).

[50] *Casanova*, *supra*, at *6.

Absent such an instruction *spread on the record*, the court of appeals reasoned, it was unable to conclude that the appellant enjoyed a fair and impartial trial.[51] Picking up on and extrapolating from the court of appeals's reasoning, the appellant now urges us to hold that the trial court's failure to read the charge aloud constitutes a kind of structural error which, because Rule 606(b) renders him incapable of demonstrating harm, must be deemed automatically, and *a fortiori*, egregiously harmful.[52]

Given the plain statutory language of Article 36.19, however, we are not at liberty to adopt this approach. The applicable portion of Article 36.19, as construed by *Almanza*, mandates that, in the absence of a trial objection, "the judgment shall not be reversed . . .

---

[51] *Id*.

[52] The appellant cites a number of cases from other jurisdictions in support of his argument that trial court error in failing to read the jury charge aloud should be immune from a harm analysis. None is as close on point as this Court's opinion in *Quinn*, and none involves a statutory analog to our Article 36.19. *See United States v. Noble*, 155 F.2d 315, 316 (3rd Cir. 1946) (trial court erred in failing to instruct the jury orally or in writing "as to the nature and elements" of the offenses he allegedly committed, and the error was not rendered harmless by permitting the jurors to take the charging instrument with them into the jury room); *State v. Norris*, 699 P.2d 585, 589 (Kan. Ct. App. 1985) (reversible error occurred when "the court did not read the instructions to the jury and did not even instruct the foreman of the jury to do so"); *People v. Marquez*, *supra*, at 1312 (reversible error where trial court failed, *over objection*, "to instruct the jury orally [which] makes it impossible for an appellate court to determine from the record whether each juror was aware of the elements of each crime before the verdict was rendered"); *State v. Lamb*, 541 N.W.2d 457, 458-59 (N.D. 1996) (trial court committed reversible error when it refused, *over objection*, to read jury instructions aloud but instead instructed the jury foreman to read them aloud during deliberations); *United States v. Perry*, 479 F.3d 885, 893-94 (D.C. Cir. 2007) (trial court's failure to read portions of jury instructions out loud did not, in the absence of any objection, constitute plain error calling for reversal on appeal).

unless it appears from the record that the defendant has not had a fair and impartial trial."[53]

The court of appeals believed that the record failed to demonstrate that the purposes of Article 36.16's requirement that the judge read the charge aloud were served in this case, those purposes being "to enable counsel to object to the instructions and ensure that each member of the jury actually receives the instructions in an unbiased and clear manner."[54] But the record in no way indicates that these purposes were *not* served. The appellant has identified no specific objection to the written jury charge that he now claims he would have leveled had the instructions been read aloud in open court.[55] And while the reporter's record clearly reveals that the trial court erred by not reading the charge out loud in open court, it just as clearly reveals that the trial court instructed the jury to read the charge aloud in the jury room. It does not appear from the record that the jury ignored this explicit instruction.

---

[53] TEX. CODE CRIM. PROC. art. 36.19.

[54] *Casanova*, *supra*, at *5.

[55] It is at least questionable whether it is accurate to say, in Texas, that permitting objections to be made to the content of the jury charge constitutes one of the purposes of requiring the trial court to read it aloud. The court of appeals cited a federal case for this proposition. *Id*. (citing *United States v. Noble*, *supra*, at 318 ("counsel and the defendant [are] entitled to hear the instructions in order that they may, if they are incorrect, object to them and secure their prompt correction by the trial judge")). In Texas, however, Articles 36.14 through 36.16 of the Code of Criminal Procedure embrace a fairly comprehensive scheme for reviewing the trial court's charge in advance and making any objections or requests during the jury-charge conference, "and thereupon the judge shall read his charge to the jury as finally written[.]" TEX. CODE CRIM. PROC. arts. 36.14, 36.15 & 36.16. In any event, the appellant does not even now claim that, had the jury charge been read aloud, he would have noticed that it lacked an accomplice-witness instruction and objected on that basis.

Nor does the record provide any reason to believe that the juror selected to read the charge aloud in the jury room failed to do so "in an unbiased or clear manner." If the present record triggers any particular presumption, therefore, it should be the usual presumption that jurors follow the trial court's explicit instructions to the letter.[56] And, presuming that the appellant's jury did so, we have no occasion to conclude, as the court of appeals did, that the jury did not receive proper instructions with respect to the law applicable to the appellant's case. To whatever extent that Rule 606(b) might restrict the appellant's ability to overcome this quotidian appellate presumption,[57] that does not justify appellate abrogation of the plain dictates of Article 36.19. It is just another one of the unavoidable systemic costs imposed by the policy of jury insulation that Rule 606(b) favors.[58] We hold that the court of appeals

---

[56] *E.g.*, *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) ("On appeal, we generally presume the jury follows the trial court's instructions in the manner presented. The presumption is refutable, but the appellant must rebut the presumption by pointing to evidence that the jury failed to follow the trial court's instructions.") (footnotes omitted).

[57] We need not decide that question in the instant case. Neither the State nor the appellant has offered affidavits or testimony from any juror to show whether or not the jury actually did read the jury charge aloud in the jury room, as instructed.

[58] *See* Steven Goode, Olin Guy Wellborn III & M. Michael Sharlot, 1 TEXAS PRACTICE: GUIDE TO THE RULES OF EVIDENCE §606.2, at 673 & 675-76 (3rd ed. 2002) ("The question, which has vexed courts for years, is how far can the legal system go in opening verdicts to attack . . . before the cure becomes worse than the disease. * * * The promulgation in 1983 of Civil Rule 606(b) moved Texas back toward its original view favoring the protection of jurors and the finality of their judgments over the desire to rectify verdicts arrived at through irregular means. * * * Consistent with traditional criminal practice, former Criminal Rule 606(b) authorized the admission of juror testimony 'as to any matter relevant to the validity of the verdict or indictment.' Consolidated Rule 606(b) abruptly ended this practice. * * * Once notoriously receptive to the practice of allowing jurors to impeach their verdicts, Texas now evinces a marked antipathy to it on both the civil and criminal sides of the

erred to conclude that the record shows that the appellant suffered egregious harm from the trial court's failure to read the jury charge aloud.

## CONCLUSION

Accordingly, we reverse the judgment of the court of appeals and remand the cause to that court to address the appellant's remaining claim of trial error.[59]

DELIVERED:      November 21, 2012
PUBLISH

---

docket.") (footnotes omitted); *McQuarrie v. State*, ___ S.W.3d ___, 2012 WL 4796001, at *7-8 (Tex. Crim. App., delivered Oct. 10, 2012) (discussing "policy considerations that generally support the common-law rule against the admission of jury testimony to impeach a verdict"); *id*. at *16 (Cochran, J., dissenting) (enumerating the "several important public policy interests" that Rule 606(b) serves, while recognizing that "the rule extracts great costs as well"). *See also Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 666 (Tex. 2009) ("We have previously articulated some reasons underlying the prohibition of unfettered probing into jury deliberations: (1) keeping jury deliberations private to encourage candid discussion of the case, (2) protecting jurors from post-trial harassment or tampering, (3) preventing a disgruntled juror whose view did not prevail from overturning the verdict, and (4) protecting the need for finality.").

[59] In his first point of error on appeal, the appellant claimed that the trial court erred during the jury selection process. Because the court of appeals reversed the conviction on the basis of jury-charge error, it did not reach this issue in its initial opinion.