**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-14-00175-CR**

_____

**SHACOBI DESHANE YATES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 10-08451**

**MEMORANDUM OPINION**

A jury convicted appellant Shacobi Deshane Yates of aggravated robbery and assessed punishment at twelve years of confinement. In four appellate issues, Yates contends the evidence was legally insufficient to support the verdict, he suffered egregious harm because the trial court did not charge the jury regarding accomplice testimony, and the trial court abused its discretion by permitting testimony about the autopsy of the victim and admitting autopsy photographs into evidence. We affirm the trial court's judgment of conviction.

1

## THE EVIDENCE

The victim's brother, Gregory Pumphrey, testified that the victim had taken medical retirement due to open heart surgery and a back problem. Pumphrey explained that on December 10, 2009, he received a call from the victim, during which the victim asked him to come to his home. Upon arriving at the victim's home, Pumphrey noticed that the victim's head and eyes were swollen. Pumphrey testified that the first thing he asked the victim was whether he had fallen because the victim "had a problem sometimes walking and he would fall[.]" The victim told Pumphrey "that a juvenile . . . had come by and brought three other guys with him and they roughed him up, beat him up." According to Pumphrey, the victim told him that "[a juvenile, B.A.,] had come over and had three other guys with him and they jumped him." Pumphrey also learned that the victim's cell phone and medication were missing.

Pumphrey recognized the name of the juvenile, and Pumphrey and the victim went to find the juvenile, whom Pumphrey knew to be fourteen-year-old B.A. Pumphrey did not know the names of the three people who had gone with B.A. to the victim's home. Upon arriving at B.A.'s residence, Pumphrey asked B.A. who the other three people were that he brought to the victim's home, and B.A. denied knowing what Pumphrey was talking about. Pumphrey stated that the

victim asked B.A., "Why did you let those guys beat me up?" Pumphrey testified that he saw Yates hiding behind a building, apparently looking to see what was going on. Pumphrey recalled Yates's face after seeing his photograph, but Pumphrey did not mention to the police that he had seen Yates. Pumphrey explained that the victim began complaining of chest tightness, and their sister took the victim to the emergency room. The victim went into a coma later that night and died the next day. Pumphrey and his family learned that the cause of the victim's death was a brain hemorrhage caused by trauma.

Sergeant L.D. Keen of the Beaumont Police Department testified that he received a phone call from the patrol officer who was at the scene of the aggravated robbery. During the phone call, Keen learned of potential witness B.A., and he instructed the patrol officer to bring B.A. to his office. B.A. gave a sworn statement, in which he implicated Yates and another individual, T.W. B.A. told Keen that he saw Yates hit the victim five or six times. The next day, Keen learned that the victim was in a coma and was not expected to survive, and Keen located Yates and took him into custody. Yates gave a sworn statement in which he identified a fourth suspect, M.G., and although Yates placed himself at the scene, Yates stated that M.G. initiated the assault on the victim. Yates told Keen that the

3

victim's cell phone was stolen during the offense. In addition, Yates indicated that he, T.W., and B.A., fled the scene after the robbery.

Keen located T.W. and obtained a statement from him. According to Keen, T.W. implicated the same individuals. Keen also located M.G. and obtained a sworn statement from him. Keen explained that the authorities believed B.A.'s original statement contained falsehoods and omissions, so Keen obtained a second statement from B.A. Keen testified that B.A. changed his story in the second statement, but B.A. indicated that the same four actors were involved in the offense. B.A. told authorities that B.A. and Yates both knew the victim because they had been at the victim's home the day before the offense. B.A. was then taken into custody. When T.W. was arrested, he gave a second statement that Keen explained was inconsistent with his initial statement.

According to Keen, the authorities subpoenaed the records from the victim's cell phone and began tracing incoming and outgoing numbers. The authorities determined that one of the numbers called from the cell phone was a telephone number belonging to M.G.'s girlfriend, and the authorities took a statement from M.G. and then arrested him. Keen received evidence from M.G.'s girlfriend that M.G. had rings in his possession, one of which had the initial "P." The victim's family told the authorities that the victim owned a ring with the initial "P." B.A.,

4

T.W., and M.G. all told authorities that the rings were in Yates's possession, but the authorities never located the rings. The authorities also learned that the Beaumont Independent School District Police Department had received a complaint that on the date of the offense, four young black men were trespassing on the property of Ozen High School, which is near the area where the crime occurred. Keen testified that based upon his investigation, he believes that Yates committed aggravated robbery with M.G., B.A., and T.W.

According to Keen, in B.A.'s first statement, B.A. admitted to being with T.W. and Yates on the day of the offense, and he stated that he had introduced Yates to the victim. B.A. averred that Yates hit the victim with his fist six times, and B.A. indicated that he and Yates ran out of the house and through the field at Ozen High School after the offense. In his original statement, B.A. also averred that Yates had the victim's rings after the offense. Keen testified that in his second statement, B.A. indicated that Yates had told him the victim had rings and money, and that T.W. and Yates said, "we['re] going to get him[.]" In the second statement, B.A. averred that Yates and M.G. planned to be the ones who would hit the victim and Yates planned to take the victim's jewelry. According to Keen, B.A. said in his second statement that Yates struck the victim's head with his fist three or four times, and they ran to Ozen High School. According to Keen, B.A. said in

his second statement that the victim said he could recall "a cock-eyed dude that was bright-skinned[,]" and that B.A. knew the victim was referring to Yates. Keen testified that the consistencies between the statements of B.A., M.G., and T.W. were that each admitted that they all went to the victim's home, someone hit the victim, and someone stole the victim's rings and cell phone.

At trial, T.W. admitted making a statement to Keen, and he testified that on the day of the offense, he approached B.A. and asked B.A. why he was not in school. T.W. testified that B.A. told him that Yates was suspended, so he and B.A. went to Yates's apartment. According to T.W., Yates came outside, and the group then went to M.G.'s apartment. T.W. testified that B.A. told them he knew a man from whom they could earn some money, and B.A. took them to the victim's home. T.W. explained that when the group arrived at the victim's home, the victim asked B.A. if he and Yates had split the money from the work they had done the previous day. After speaking with the victim from the porch, T.W. asked the victim if he could enter the house to use the restroom, and T.W. testified that upon entering the house, he took some money and jewelry and went back outside.

According to T.W., the victim eventually invited them inside. T.W. testified that he did not see what occurred in the victim's kitchen, but he saw the victim falling backward and M.G. standing in front of the victim. T.W. explained that

6

after realizing the victim had been hit, everyone ran outside and "split up." T.W. testified that he threw away the money and jewelry he had taken from the victim's home, and that M.G. had the victim's cell phone. T.W. testified that he gave a second statement to the police, and he admitted that he did not tell the truth in either of his statements. T.W. testified that he did not know M.G. was going to hit the victim. According to T.W., he and Yates ran out the front door after M.G. hit the victim, and he testified that they jumped the fence onto the property of Ozen High School.

Forensic pathologist Dr. Tommy Brown testified that he performed an autopsy on the victim's body. Brown identified seven photographs, State's exhibits 12, 13, 14, 20, 21, 22, and 23, as depicting the victim's body as it appeared when it arrived for the autopsy, and the trial court admitted the photographs into evidence over defense counsel's objection to both the photographs and Brown's testimony. Brown testified that the victim "had some abrasions of his forehead[,]" "a large hematoma around his right eye[,]" and a curvilinear abrasion "just below his right breast on his chest." Brown testified that State's exhibit 12 showed the hematoma and swelling around the victim's right eye and cheek area, as well as a contusion and small abrasion on his right forehead; exhibit 13 showed the abrasion on the left side of the victim's forehead; exhibit 20 showed "another view from the lateral

side of the right eye showing the hematoma of the eye[;]" exhibit 21 depicted the curvilinear abrasion beneath the victim's right breast; exhibit 22 showed a close-up view of the curvilinear abrasion beneath the victim's right breast; and exhibit 23 showed a small bruise on the left side of the victim's forehead.

Brown explained that his internal investigation of the victim's body revealed a "sub scalp hemorrhage about his forehead on both left and right sides[,]" as well as "a large subdural hematoma or blood on top of the brain along the left side of the brain." According to Brown, the internal examination also revealed a laceration on the victim's brain stem, which usually occurs "from the subdural hematoma that puts pressure on that area and causes the laceration." Brown further explained that a subdural hematoma is a rupture of the small vessels in the brain, which causes bleeding and compresses the cerebral hemispheres, and is usually secondary to trauma. Brown opined that "the cause of death was blunt force trauma to the head with a subdural hematoma[,]" and the manner of death was homicide. Brown testified, "I can't tell you what [the victim] was struck with or fist, club, or whatever, stomped on, anything." Brown explained that the victim could have been struck with a hand, a fist, or an object. During cross-examination, defense counsel asked whether some of the victim's bruises could have been caused by falling, and

8

Brown responded affirmatively. The State rested at the conclusion of Brown's testimony.

Yates testified that he and B.A. went to the victim's home the day before the offense to do some odd jobs, and they tried to help the victim install a shelf. According to Yates, on the day of the offense, T.W. and B.A. came to his residence and awakened him, and the group later met M.G. at the apartment complex pool. The group eventually decided to return to the victim's house to possibly get some money for work. Yates denied that the group had agreed to rob the victim. Yates testified that he, T.W., B.A., and M.G. went to the victim's house and spoke to the victim on the front porch. The group eventually entered the victim's house, and Yates testified that "[M.G.] just started hitting [the victim]." Yates testified that he was shocked, and that he ran because he knew M.G. hitting the victim was wrong. Yates denied hitting the victim or taking anything that belonged to the victim. Yates explained that when he and the others fled, they ran through the grounds of Ozen High School.

## ISSUE ONE

In his first issue, Yates challenges the legal sufficiency of the evidence supporting his conviction. Yates contends that "the record is completely devoid of any evidence that [he] struck the complainant as alleged in the indictment[,]" and

that the only way the jury could have found that Yates was a party to the offense was "to believe the accomplice testimony the State attempted to elicit."

When reviewing the legal sufficiency of the evidence, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury is the ultimate authority on the credibility of witnesses and the weight to be given their testimony. *Brooks v. State*, 323 S.W.3d 893, 894, 902 (Tex. Crim. App. 2010); *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981). We give deference to the jury's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). A person commits the offense of aggravated robbery if, in the course of committing robbery, he causes serious bodily injury to another. Tex. Penal Code Ann. § 29.03(a)(1) (West 2011). In this case, the indictment alleged that while in the course of committing theft of the victim's property, Yates intentionally and knowingly caused serious bodily injury to the victim by hitting the victim with his hands.

Article 38.14 of the Texas Code of Criminal Procedure provides that a defendant cannot be convicted of an offense upon the testimony of an accomplice

10

without other corroborating evidence tending to connect the defendant to the offense. Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005). When reviewing the sufficiency of non-accomplice evidence under article 38.14, we determine whether the inculpatory evidence tends to connect the defendant to the commission of the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). "The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense." *Id.*; *see also Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009). No particular quantity of corroborating evidence is required. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). "'Tendency to connect' rather than rational sufficiency is the standard[;] the corroborating evidence need not be sufficient by itself to establish guilt." *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). Non-accomplice evidence need not directly link the defendant to the commission of the crime. *See id*.

Although a defendant's mere presence at the scene of a crime is insufficient to link him to the commission of the crime, a defendant's presence, coupled with other suspicious circumstances, can be sufficient to tend to connect the defendant to the commission of the crime. *Id*. at 361-62. Suspicious circumstances may include the defendant's being in the company of an accomplice near the time of the

11

offense. *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984). When there are conflicting views of the evidence, we defer to the fact finder's resolution of the evidence. *Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 508.

With respect to accomplice evidence, the jury heard evidence that B.A. gave a statement in which he averred that Yates struck the victim with his fist six times, and that Yates had the victim's jewelry after the offense. The jury heard evidence that B.A., T.W., and M.G. all gave statements to the authorities indicating they went to the victim's home, someone struck the victim, and someone stole the victim's rings and cell phone.

With respect to the non-accomplice evidence, Sergeant Keen testified that after the offense, four young men were observed trespassing on the property of Ozen High School, and Yates testified that he and T.W. fled onto the grounds of Ozen High School after the offense. Pumphrey testified that the victim told him that B.A. and three other guys had "jumped him" and beaten him. In addition, Pumphrey recalled seeing Yates hiding behind a building after the offense. We find that the testimony of Sergeant Keen, Yates, and Pumphrey corroborated the accomplice testimony and their testimony tends to connect Yates to the offense. *See Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 508; *Solomon*, 49 S.W.3d at 361-62; *see generally* Tex. Code Crim. Proc. Art. 38.14. Viewing all of the

12

evidence in the light most favorable to the verdict, we conclude that a rational jury could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. Accordingly, we overrule issue one.

## ISSUE TWO

In his second issue, Yates argues that he was egregiously harmed because the trial court failed to charge the jury regarding accomplice testimony. "A prosecution witness who is indicted for the same offense with which the defendant is charged is an accomplice as a matter of law." *Herron v. State*, 86 S.W.3d 621, 631 (Tex. Crim. App. 2002). "If a prosecution witness is an accomplice as a matter of law, the trial court is under a duty to instruct the jury accordingly." *Id*. Failure to give the accomplice witness instruction is error. *Id*.; *see also Casanova v. State*, 383 S.W.3d 530, 533 (Tex. Crim. App. 2012). In this case, it is undisputed that T.W., B.A., and M.G. were charged with the same offense as Yates and are accomplice witnesses as a matter of law. *See Casanova*, 383 S.W.3d at 533; *see also Herron*, 86 S.W.3d at 631. Therefore, the trial court erred by failing to charge the jury regarding accomplice witness testimony. *See Herron*, 86 S.W.3d at 631; *see also Casanova*, 383 S.W.3d at 533.

The appropriate harm standard depends upon whether the defendant preserved error by bringing the omission of the instruction to the trial court's

13

attention. *See Herron*, 86 S.W.3d at 632; *see also Casanova*, 383 S.W.3d at 533-34. If, as here, the defendant failed to preserve error by bringing omission of the instruction to the trial court's attention, we will reverse only if the error is fundamental and "was so egregious and created such harm that the defendant 'has not had a fair and impartial trial.'" *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). Under the egregious harm standard, omission of the accomplice-witness instruction is generally harmless unless the non-accomplice evidence is "'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *Herron*, 86 S.W.3d at 632 (quoting *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)). We must take the entire record into account in determining whether Yates was egregiously harmed by omission of the instruction. *See Casanova*, 383 S.W.3d at 534.

As discussed above in our analysis of issue one, the jury heard accomplice evidence that Yates struck the victim with his fist several times and had the victim's jewelry in his possession after the offense. The non-accomplice evidence from Sergeant Keen, Yates, and Pumphrey corroborated the accomplice testimony because it tended to connect Yates to the offense. The non-accomplice evidence

14

was not so unconvincing as to render the State's overall case for conviction clearly and significantly less persuasive. *See Herron*, 86 S.W.3d at 632. We therefore find that the trial court's failure to give the accomplice-witness instruction did not egregiously harm Yates. *See Barrios*, 283 S.W.3d at 350. Accordingly, we overrule issue two.

ISSUES THREE AND FOUR

In his third issue, Yates argues that the trial court abused its discretion by admitting into evidence Brown's testimony concerning his autopsy of the victim. In his fourth issue, Yates contends the trial court abused its discretion by admitting autopsy photographs into evidence. Yates argues that the probative value of Brown's testimony and the autopsy photographs is substantially outweighed by the danger of unfair prejudice because Yates stipulated at trial that the victim suffered serious bodily harm. We address issues three and four together.

We review a trial court's decision to admit evidence over a Rule 403 objection for an abuse of discretion. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007); *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005); *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999). The trial court abuses its discretion only when its decision lies outside the zone of reasonable disagreement. *Mechler*, 153 S.W.3d at 439-40; *Montgomery v. State*,

15

810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). The trial judge has wide discretion in determining the admissibility of photographs. *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995). When a trial court balances the probative value of the evidence against the danger of unfair prejudice, a presumption exists that favors the evidence's probative value. *Feldman v. State*, 71 S.W.3d 738, 754-55 (Tex. Crim. App. 2002).

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R. Evid. 401. Under Rule 403 of the Texas Rules of Evidence, a trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and presumes that relevant evidence will be more probative than prejudicial. *Etheridge v. State*, 903 S.W.2d 1, 21 (Tex. Crim. App. 1994).

In conducting an analysis under Rule 403, the trial court must balance the following factors: (1) the probative value of the evidence, (2) the potential to impress the jury in some irrational, yet indelible, way, (3) the time needed to

16

develop the evidence, and (4) the proponent's need for the evidence. *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004); *see also Casey*, 215 S.W.3d at 880 (citing *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006)). In analyzing the autopsy photographs under Rule 403, we consider "the number of photographs, the size, whether they are in color or are black and white, whether they are gruesome, whether any bodies are clothed or naked, and whether the body has been altered by autopsy." *Erazo*, 144 S.W.3d at 489.

In conducting its balancing test under Rule 403, the trial court determined that Brown's testimony and the photographs were relevant and probative as to the issue of serious bodily injury despite Pumphrey's testimony regarding the appearance of the victim's injuries and the victim's subsequent death. The trial judge stated that Pumphrey is not an expert and "there has been no other testimony regarding the extent of the injuries or the cause of death or linking the serious bodily injury to this crime specifically." The trial judge concluded that the testimony and photographs would not confuse or mislead the jury, the photographs would help the pathologist explain the victim's injuries, and the photographs were not "gruesome or overly prejudicial."

As discussed above, Brown testified regarding the nature of the victim's injuries, and he explained that the cause of the victim's death was blunt force

17

trauma to the head with a subdural hematoma and the manner of death was homicide. The photographs admitted as state's exhibits 12, 13, 14, 20, 21, 22, and 23 were 8½-inch by 11-inch color photographs. Exhibit 12 is a close-up view of a swollen, discolored area above the victim's right eye, which Brown testified was a hematoma. Exhibit 13 is a close-up view of an abrasion on the left side of the victim's forehead. Exhibit 14 is a frontal view of the victim's face, neck, and the uppermost portion of his chest, and it depicts the swelling and discoloration of the victim's right eye and forehead. Exhibit 20 is a close-up side view of the victim's discolored and swollen right eye. Exhibit 21 depicts the victim's right arm and chest, and it shows an abrasion on the right side of the victim's chest. Exhibit 22 is a closer view of the victim's chest abrasion than Exhibit 21, and Exhibit 23 is a side view of a bruise on the left side of the victim's face.

The State argues that the probative value of the evidence is not outweighed by any unfairly prejudicial effect because proof of serious bodily injury is an element of the offense of aggravated robbery. *See* Tex. Penal Code Ann. § 29.03(a)(1). While the State does have the burden to prove serious bodily injury beyond a reasonable doubt, Yates stipulated at trial that the victim suffered serious bodily injury. Because Yates stipulated that the victim suffered serious bodily injury, Brown's testimony and the autopsy photographs have limited probative

18

value. *See Petruccelli v. State*, 174 S.W.3d 761, 766 (Tex. App.—Waco 2005, pet. ref'd). However, as previously discussed, the jury heard evidence that the victim had a tendency to stumble and fall, and that Pumphrey initially believed the victim might have fallen until the victim told him otherwise. In addition, defense counsel asked Brown during cross-examination whether some of the victim's injuries could have been caused by a fall. Therefore, Brown's testimony and the photographs are relevant and probative to establish that the manner in which the victim sustained his serious bodily injuries was not accidental, such as from a fall, but instead resulted from intentional acts.

Because the testimony and photographs were relevant, they are admissible unless the prejudicial impact of the pictures substantially outweighs their helpfulness. *See Erazo*, 144 S.W.3d at 490. As explained above, Brown's testimony and the autopsy photographs were probative as to the manner in which the victim sustained his injuries. The record reflects that Brown's testimony began at 1:24 p.m. and concluded at 1:40 p.m., so Brown only testified for approximately sixteen minutes. Brown's testimony was clinical and it related solely to the appearance of the victim's body, the nature of the victim's injuries, and the cause and manner of the victim's death. Although the photographs show bruises, swelling, and abrasions on the victim's head, they are not so gruesome as to

impress the jury in some irrational yet indelible way. *See id*. at 489. With the exception of two photographs showing the victim's bare chest, the victim's body below the neck is either clothed in a hospital gown or not visible. The photographs do not depict any mutilation or alteration of the body from the autopsy. The photographs are not so disturbing that a juror of normal sensitivity would find it difficult to rationally decide the critical issues involved in the case after viewing them. *See Alvarado v. State*, 912 S.W.2d 199, 212 (Tex. Crim. App. 1995); *see also Purtell v. State*, 761 S.W.2d 360, 370-71 (Tex. Crim. App. 1988). We therefore conclude that the trial court did not abuse its discretion by admitting the photographs. In addition, we conclude that even if admitting Brown's testimony and the autopsy photographs had been erroneous, Yates has not demonstrated that their admission contributed to his conviction. *See* Tex. R. App. P. 44.2(a). For all of these reasons, we overrule issues three and four and affirm the trial court's judgment.

  AFFIRMED.

           _____

           STEVE McKEITHEN
           Chief Justice

Submitted on January 20, 2015
Opinion Delivered April 1, 2015
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.