**AFFIRMED; Opinion Filed December 31, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-12-01413-CR

**ERIK JAMAL JACKSON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 1**
**Dallas County, Texas**
**Trial Court Cause No. F-1163319-H**

## MEMORANDUM OPINION

Before Justices FitzGerald, Fillmore, and Stoddart
Opinion by Justice Stoddart

A jury convicted Erik Jamal Jackson of aggravated robbery and sentenced him to 15 years' confinement. In two issues, Jackson argues the trial court erred by failing to instruct the jury on the lesser-included offense of theft and by failing to instruct the jury on the accomplice witness rule. We affirm the trial court's judgment.

The State alleged Jackson intentionally and knowingly, while in the course of committing theft of property and with the intent to obtain or maintain control of the property, threatened and placed the victim in fear of imminent bodily injury and death, and Jackson used and exhibited a firearm. At trial, the victim of the crime was the State's first witness. Ramiro Adame testified that on December 23, 2011, he left a bar about 1:00 a.m. He saw a "girl" in the parking lot and, because it was cold outside, Adame asked the girl if he could help her. The girl told Adame she was waiting for a friend, but accepted Adame's offer to wait in his car until her friend arrived.

Adame testified that once the girl was in the car, she was texting with someone on her phone. Adame stated "she kept saying that she had a friend coming by or close by, and he's going to pick me up." After about 10 minutes, her friend still had not arrived. The girl asked Adame for money. When he said he was not going to give money to her, she offered to have sex with Adame for money; he declined this offer.

A gas station was down the street from the bar. Adame wanted to go to the gas station and get something to drink and the girl rode in the car with him. During this time, the girl continued texting on her phone.

When they returned to the car after going into the gas station, Adame offered to take the girl back to the bar. Instead, as they drove back, she instructed him to turn on to a side street and said her friends would pick her up there. At some point, the girl told Adame to park. He described the area where he parked: "There's a small convenience store, kind of like a gas station, and there's a warehouse there and there's a parking lot. Eventually there's a lot, a parking lot, so she told me to park right behind there or right just kind of like behind the gas station at the warehouse, and I parked right there where she told me to." No other cars were in the parking lot.

As soon as Adame parked, someone opened his car door. Adame testified: "So they pull me out and say get out of the car. I kind of tried to turn around, and I didn't have a chance because they told me to don't [sic] look at them, and they had a gun pointed at me, so they told me to don't [sic] look at them so I just followed their directions." Adame thought there was more than one attacker. The people who took him out of his car, took everything he had in his pockets, including his wallet and iPhone. They also took some items from the car.

Adame testified the girl was not robbed and did not seem scared; she left with the people who robbed him. Adame stated he did not see his attackers well and would not be able to identify them.

Demone Butler testified as the State's second witness. He was charged with aggravated robbery along with Jackson and Monique Adley, the "girl" who was in the car with Adame. Adley was Jackson's girlfriend. Butler testified he attempted to go to a club with Jackson, Adley, Jackson's brother, and some other people on December 23, 2011, but they were not admitted because they were underage. Butler and Jackson's brother each had a gun.

Butler testified that after they were turned away from the club, Jackson said "he's about to go make some money." Butler believed this meant Jackson planned to have Adley prostitute herself. They left the club and Jackson drove his car (carrying Butler and Adley) to a parking lot where they dropped off Adley.

Butler testified he and Jackson drove away after dropping off Adley and went to a vacant "road next to some office buildings." Jackson said the location was where they would pick up Adley. When they parked near the office buildings, a car carrying Jackson's brother and his friends parked alongside them. Jackson, his brother, and his brother's friends all got out of their cars. Butler testified that when Jackson was exiting the car, he asked Butler for Butler's gun. Butler refused to give it to him.

Butler stayed in Jackson's car and the other men retreated into the darkness. He did not see where they went or what happened, he did not see a robbery occur, he did not see whether anyone had a gun. After a couple of minutes, the men and Adley returned to the cars and the cars drove away. When Jackson and Adley got back into the car, Adley was "going through some cards," credit cards. They also had an iPhone with them. No one talked about what happened.

Jackson drove to a restaurant and then a gas station. Butler testified that at the gas station, a "cop car started pulling up, and one of the cops gets out, and he was like we tracked her right here or whatever and I think he's like that. And then [Jackson] grabbed the phone from her, and he hands it to me and he told me to put it up." Butler testified he put the phone in the armrest in the back seat. The police arrested Jackson, Butler, and Adley.

Officer Donald Ritchie was a Dallas police officer on December 23, 2011. On that night, he received a call at 2:28 a.m. about a robbery. He met Adame at a gas station. Adame told Ritchie he had been robbed by several black males and a black female; they took his money, wallet, phone, and property. When Ritchie learned Adame's phone was an iPhone, Ritchie used his own iPhone to track it. Ritchie was "able to see that the phone was still active and moving at that time." Ritchie began driving and following the iPhone; he followed the iPhone to a gas station. The iPhone signal was stationary at the gas station for a while. When the signal moved again, Richie was able to determine which car the phone was in. Ritchie relayed the vehicle's information to another officer who stopped the car. The officer found the iPhone, several other cell phones, a gun, a Halloween mask, and cash in the car. He did not find a wallet or credit cards. Jackson, Butler, and Adley were in the car. The iPhone was located in the backseat of the car where Butler had been sitting.

Jackson testified in his defense. Jackson stated he and Adley went to a club that was in close proximity to the club where Adame met Adley. Butler was with them. Jackson and Adley had an argument. After they were unable to get into the club, Jackson testified he told Adley "I wasn't going to waste no more gas or time on taking her nowhere else." Adley got out of the car and began pacing back and forth in front of the car. Adley then retrieved her purse from the car and walked away. Jackson said he did not leave the parking lot because he was expecting his brother to come to the club. Ten to fifteen minutes later, his brother and two friends arrived.

–4–

Jackson sent Adley a text that said "go to the spot?" Thirty seconds later, Adley replied "go to the spot." Jackson testified a restaurant was "the spot."

Jackson testified he and his brother drove their cars to a nearby restaurant. Jackson looked inside the restaurant to see if Adley was there. When he discovered she was not, Jackson called her on her phone. Adley told him that she was at a gas station; a guy had seen her walking and offered to give her a ride. Adley told Jackson she would ask the man to take her to the restaurant. The phone hung up and Adley did not arrive at the restaurant. Jackson called Adley again, but she did not answer. Jackson became concerned because she was not answering her phone, her phone had hung up while they were talking, and Adley was in the car with a man. Jackson stated he decided to go to the gas station to find Adley; his brother was going to drive his own car to the gas station.

As they drove, Jackson noticed his brother was in the wrong lane. His brother was following a car matching the description of Adame's car. Adame turned on a side street and Jackson's brother followed. Due to traffic lights and the lane Jackson was in, he was delayed in following Adame and his brother. When Jackson turned on the side street, he did not see Adame's or his brother's car. Jackson began driving through the warehouses and "I come out of the last one and I see Ms. Adley coming up the street, on the sidewalk." Adley got into Jackson's car. Jackson testified: "She had a puzzled look on her face, and she got in the car. . . I kind of started yelling at her because I'm not understanding why you're over here anyways, what's going on or why are you even over here."

Jackson said Adley told him the following story about encountering Adame:

That's when she tells me about how she got in the car with Adame. She said that she -- that Adame had seen her walking west of the club, Club Kendall's, and he had stopped and offered her a ride. She told him no. He offered again. She told him no, that she had a ride, she's good, she doesn't need a ride from him. So he tried to bribe her to get in the car, it was cold outside. So she finally was like oh, okay, so she got in the car. From there Adame said well, let me go to the store

–5–

first, so he made a stop at the store. That's when I found out that that's -- the RaceTrac is where they was at. That's how I found out that they got to the RaceTrac.

After Jackson picked up Adley, he contacted his brother and they agreed to meet at a gas station. When Jackson arrived at the station, his brother was already there. He testified his brother walked to his car and "[t]hat's when he handed me the phone." It was an iPhone. Jackson stated he sat down in his car with the iPhone; Jackson did not know how the iPhone came to be in the backseat of the car where the police found it.

Jackson denied he was present when Adame was robbed. He did not see Adame's car parked. Jackson stated Butler also did not participate in the robbery. He stated the money in Adley's purse was from Adame because Adame paid Adley for sex. Although Jackson stated several times he believed no robbery occurred, in a separate proceeding Adley pleaded guilty to aggravated robbery.

In his first issue, Jackson asserts theft is a lesser-included offense of aggravated robbery and the trial court erred by failing to instruct the jury on theft. In his brief, Jackson argues the basis for his request for the theft instruction is Butler's testimony that when the police approached Jackson's car, Jackson gave the phone to Butler to put in the armrest. Jackson argues this action is some evidence Jackson knew the phone was stolen.

The trial court's decision to submit or deny a lesser included offense instruction is reviewed for an abuse of discretion. *Threadgill v. State*, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004). We apply a two-pronged test to determine if the trial court should have given a jury charge on a lesser-included offense. *Hall v. State*, 225 S.W.3d 524, 535–36 (Tex. Crim. App. 2007). We first determine if the proof necessary to establish the charged offense includes the lesser offense. *Id*. If it does, we then review the evidence to determine that if appellant is guilty, he is guilty only of the lesser offense. *Id*. at 536.

–6–

The second step is a question of fact and is based on the evidence presented at trial. *Cavazos v. State*, 382 S.W.3d 377, 383 (Tex. Crim. App. 2012). This step requires the reviewing court to determine whether "there is some evidence in the record which would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense." *Rice v. State*, 333 S.W.3d 140, 145 (Tex. Crim. App. 2011). This evidence must show the lesser included offense is a "valid, rational alternative to the charged offense." *Id.* Moreover, it "is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense. Rather there must be some evidence directly germane to a lesser-included offense for the factfinder to consider before an instruction on a lesser-included offense is warranted." *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997).

Even if we were to conclude that theft is a lesser-included offense of aggravated robbery in this case, we cannot conclude that if Jackson is guilty, he is only guilty of theft. A person commits the offense of theft if he unlawfully appropriates property with the intent to deprive the owner of the property. TEX. PENAL CODE § 31.03(a). An appropriation of property is unlawful if it is without the owner's effective consent or if the property is stolen and the actor appropriates the property knowing it was stolen by another. *Id.* § 31.03(b). In his brief, Jackson argues the latter: he took possession of the iPhone knowing it was stolen.

There is no evidence in the record showing that Jackson knew the iPhone was stolen, but did not participate in the robbery. Jackson denied being involved in the robbery, said he did not see a robbery occur, and testified he did not believe a robbery occurred. He did acknowledge taking possession of Adame's iPhone and now argues there was some evidence he knew the iPhone was stolen even though he did not participate in the robbery. The record does not support this conclusion. Based on the evidence presented at trial, the only means by which Jackson would have known Adame's iPhone was stolen when he took possession of it—whether he took

possession at the scene of the crime or at the gas station when his brother handed it to him—is if Jackson participated in the robbery. If Jackson did not participate in the robbery and did not have knowledge of a robbery, as he maintained in his testimony, then there was no way for him to know the iPhone was stolen. Therefore, Jackson could not have been only guilty of theft and the trial court did not abuse its discretion by denying Jackson's request for a lesser-included-offense instruction. We overrule Jackson's first issue.

In his second issue, Jackson argues that, with respect to Butler's testimony, the trial court erred by failing to instruct the jury on the accomplice witness rule. A "conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed." TEX. CODE. CRIM. PROC. ANN. art. 38.14; *see also Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002) (accomplice-witness instruction informs jury it cannot use accomplice-witness testimony unless there also exists some non-accomplice evidence connecting defendant to the offense).

Jackson did not object at trial to the trial court's failure to include an accomplice-witness instruction in the jury charge. Therefore, we reverse the trial court only if the record demonstrates that the error resulted in egregious harm. *Casanova v. State*, 383 S.W.3d 530, 533 (Tex. Crim. App. 2012). The court of criminal appeals has articulated the standard for determining egregious harm under *Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1985) (op. on reh'g)) in the context of the failure to submit an accomplice-witness instruction. *Id.* In *Casanova*, the court stated that if "the omission is not made known to the trial judge in time to correct his error, appellate review must inquire whether the jurors would have found the corroborating evidence so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *Id.* (quoting *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)); *see also Herron*, 86 S.W.3d at 632 (under egregious harm

standard, omission of accomplice witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.").

Whether the trial court's error in failing to submit an accomplice-witness instruction is harmful is "a function of the strength of the corroborating evidence." *Casanova*, 383 S.W.3d at 539. The *Casanova* court stated:

> As the strength of the corroborating evidence increases, however, a reviewing court may no longer be able to declare that the lack of an accomplice-witness instruction resulted in egregious harm . . . And as the corroborating evidence gains in strength to the point that it becomes implausible that a jury would fail to find that it tends to connect the accused to the commission of the charged offense, then a reviewing court may safely conclude that the only resultant harm is purely theoretical and that there is no occasion to reverse the conviction, even in the face of an objection, since the jury would almost certainly have found that the accomplice witness's testimony was corroborated had it been properly instructed that it must do so in order to convict.

*Id.* at 539-40 (internal citations omitted)

The State showed Jackson's girlfriend, Adley, accepted Adame's offer to stay in his car while she waited for some friends. While she was in the car, she constantly was texting someone. At Adley's direction, Adame parked his car in a vacant parking lot. As soon as Adame parked, he was robbed at gunpoint; the people who robbed him took his iPhone and wallet. However, Adley was not robbed, did not seem scared, and left with the people who robbed Adame. Adley subsequently pleaded guilty to aggravated robbery.

Jackson admitted to being in the vicinity where the robbery occurred at the time the robbery occurred. He admitted Adley had been in his car and she got out of his car in the same geographic vicinity. Jackson admitted that before the robbery he exchanged text messages with Adley about "go[ing] to the spot." He also admitted to being in possession of the stolen iPhone—a fact confirmed by the police officer's testimony.

–9–

The non-accomplice testimony in this case is not so unconvincing as to render the State's case clearly and significantly less persuasive. *See id.* at 533; *Herron*, 86 S.W.3d at 632. Rather, the corroborating evidence and the inferences to be drawn from the evidence more than sufficiently tend to connect Jackson to the robbery. It is implausible that the jury would have failed to find the corroborating evidence connected Jackson to the offense. Had it been properly instructed, the jury almost certainly would have found Butler's testimony was corroborated. *See Casanova*, 383 S.W.3d at 539-40. Therefore, we conclude Jackson did not suffer egregious harm from the trial court's failure to include an accomplice-witness instruction in the jury charge. We overrule Jackson's second issue.

We affirm the trial court's judgment.

/Craig Stoddart/
CRAIG STODDART
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
121413F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ERIK JAMAL JACKSON, Appellant

No. 05-12-01413-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 1, Dallas County, Texas
Trial Court Cause No. F-1163319-H.
Opinion delivered by Justice Stoddart.
Justices FitzGerald and Fillmore
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 31st day of December, 2014.