

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-24-00073-CR
_____

ERNESTO LOREDO, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

_____

On Appeal from the Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1810480

_____

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

Appellant, Ernesto Loredo, Jr., faced three charges at his trial, which began on March 19, 2024, in Fort Worth, Texas.[1] The charges arose out of an incident which occurred on November 11, 2022, between Loredo and his then-girlfriend, Andrea Orta Arellano.[2]

The jury acquitted Loredo of the first charge: third-degree felony kidnapping.[3] The jury convicted Loredo of the latter two charges: third-degree felony of unlawful restraint with "substantial risk of serious bodily injury,"[4] as well as the third-degree felony of assault of a family member by impeding normal breathing.[5] Loredo elected to have punishment assessed by the trial court. By virtue of an enhancement to which Loredo pled true,[6] the punishment range for both counts was that of a second-degree felony. The trial court sentenced Loredo to two concurrent fifteen-year sentences.

---

[1] Originally appealed to the Second Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.); TEX. R. APP. P. 41.3; *Mitschke v. Borromeo*, 645 S.W.3d 251, 258 (Tex. 2022) ("Transferee courts must follow whatever law binds the transferor court . . . .").

[2] Orta Arellano is referred to in the indictment as Orta, but at trial she testified that her last name was "Orta Arellano."

[3] *See* TEX. PENAL CODE ANN. § 20.03(a) ("A person commits an offense if he intentionally or knowingly abducts another person.").

[4] *See* TEX. PENAL CODE ANN. § 20.02(a), (c)(2)(A) (Supp.) (Unlawful restraint: "(a) A person commits an offense if he intentionally or knowingly restrains another person. . . . (c) An offense under this section is a Class A misdemeanor, except that the offense is . . . (2) a felony of the third degree if: (A) the actor recklessly exposes the victim to a substantial risk of serious bodily injury.").

[5] *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(2)(B) (Supp.) (Assault: "(a) A person commits an offense if the person: (1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse; . . . (b) An offense under Subsection (a)(1) is a Class A misdemeanor, except that the offense is a felony of the third degree if the offense is committed against: . . . (2) a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code, if: . . . (B) the offense is committed by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of the person by applying pressure to the person's throat or neck or by blocking the person's nose or mouth.").

[6] The enhancement was a 2014 conviction for aggravated sexual assault of a child.

Loredo brings three points of error.

First Loredo contends that the evidence was legally insufficient to support his conviction for unlawful restraint with substantial risk of serious bodily injury. Loredo specifically contends that there was insufficient evidence that he unlawfully restrained Orta Arellano and insufficient evidence that he recklessly exposed Orta Arellano to a substantial risk of serious bodily injury. Second, he asserts that the trial court improperly denied his request that the jury be instructed on the lesser-included offense of assault causing bodily injury. Third, he complains that the trial court erred by instructing the jury to continue deliberations when a poll of the jury initially showed that the verdict regarding assault by impeding normal breathing was not unanimous.

We deny all three points of error and affirm the convictions.

## I. Factual Background

According to Orta Arellano's testimony, she and Loredo began dating in approximately September of 2022. The relationship took off quickly, and she began staying at Loredo's residence. She did not, however, consider that living with Loredo. Orta Arellano testified that she lived with her grandmother.

On the night of November 11, 2022, Orta Arellano and Loredo went to a Fort Worth bar and at some point began arguing. They left the bar together and got into Loredo's vehicle. Orta Arellano asked to be taken home. Orta Arellano said they were upset with each other, and she thought it best that they spend the night apart. Orta Arellano testified that her grandmother's house was about a five-minute drive from the bar. Laredo missed the turn to Orta Arellano's grandmother's house. Orta Arellano told Loredo that if he did not take her home her relatives

3

would come looking for her. Loredo laughed and told Orta Arellano that her relatives would not find her.

Orta Arellano testified that she felt a warmth on the left side of her face. She could not recall being able to tell whether she had been punched or slapped. After that, things became a blur. Orta Arellano recalled Loredo grabbing her by the hair on the back of her head and bashing her face into the dashboard. She recalled Loredo, as he was driving, punching her in the face "continually." While steering with his left hand, Loredo grabbed Orta Arellano by the neck with his right hand. Orta Arellano described this as Loredo "squishing" her neck. Orta Arellano testified that she was "[n]ot really" able to breathe while Loredo was doing this. Orta Arellano fought back. Orta Arellano tried to escape. First, she grabbed the steering wheel. Then she tried putting the car into park. Loredo quickly put the car back into drive. Orta Arellano tried to put the car into park again and succeeded long enough to exit the vehicle. As Orta Arellano exited, Loredo grabbed her sweater, pulling it off her as she wriggled free and fell to the ground.

Orta Arellano did not know where they were. It was a residential neighborhood, though. She saw a house with a porch light on and ran to it.

It was the home of Patricia Torres. Torres testified that she heard a "girl" "screaming" in Spanish words that mean "Help me[!] Help me[!] He's going to kill me[!]"[7] Torres went outside to find a woman lying on the steps of her front porch, naked from the waist up, and bleeding. There was a man hovering over the woman. Initially, the man paused, appearing

---

[7]The reporter's record contains neutral punctuation of periods when transcribing the English translation provided by Torres (who is bilingual). However, exclamation marks appear to be more in keeping with the emotional tenor of the Spanish screams as and when uttered by Orta Arellano.

surprised to see Torres. But then the man grabbed the woman and began dragging her towards the street. Torres told him she was on the phone with 9-1-1 and that the call was being recorded. The man then released the woman, ran to his vehicle, and drove away.

Wesley Walters, a police officer with the Fort Worth Police Department, arrived at the Torres residence shortly afterwards. Walters testified that he found a woman distressed and "covered in blood." The woman identified herself as Orta Arellano. Orta Arellano told Walters that her assailant was Loredo, and she recounted the night's events to Walters. Orta Arellano was not expressing herself clearly. Walters could tell that Orta Arellano had been drinking that night. Orta Arellano had sustained injuries to her teeth, and she expressed difficulty speaking. Orta Arellano made contradictory statements throughout her conversation with Walters. Orta Arellano recounted living in different places, including Loredo's house, and her grandmother's. At one point, Orta Arellano said that Loredo had never beaten her before but later said that Loredo had beaten her three weeks earlier. Regarding the night of November 11, 2022, Orta Arellano told Walters that Loredo had strangled her, that at one point she had been unable to breathe, and that she thought she was going to die.

Dorian Escobar, an emergency medical technician, testified regarding her encounter with Orta Arellano that night. Escobar testified that Orta Arellano told her that her injuries were the result of Loredo beating and choking her. Orta Arellano told Escobar that she had lost consciousness at some point in the encounter with Loredo. Escobar testified that she examined Orta Arellano's neck, and that it was tender. Orta Arellano had injuries to her face and head consistent with being punched, or having her face slammed into a dashboard, or falling out of a

5

car onto concrete. Escobar testified that Orta Arellano's injuries were consistent with what Orta Arellano had told her.

Dr. Kirk Brown, the attending emergency room physician at John Peter Smith Hospital, saw Orta Arellano that night. Dr. Brown testified based on his own examination and from notes made by hospital staff. Dr. Brown also testified based on police photos, including Exhibit 16, which had been uploaded into the hospital's records.[8] Dr. Brown testified that Orta Arellano reported to hospital staff that she had been beaten and strangled. Dr. Brown testified that Orta Arellano's front teeth were displaced and that the facial bones around her teeth were broken. Dr. Brown testified that Orta Arellano showed evidence of strangulation. Dr. Brown testified to what he meant by "strangulation": "It is basically to key you in to the fact that there are some big blood vessels [in the neck], they are critical to your brain; and if they are sort of closed off or stopped in any way, then you could have significant injury to the brain." Dr. Brown testified that strangulation can lead to death.

Orta Arellano testified that, in the days after November 11, 2022, Loredo texted her, expressing a desire to get back together. As part of that exchange, Loredo denied beating Orta Arellano: "I did not hit you[.] I tried to keep you from jumping out." Loredo asked Orta Arellano, "Why are you saying I hit you?" Loredo later texted, "I won't ever again."

---

[8]Orta Arellano testified that, at the hospital, a police officer took a photo of her showing bruising on her neck. That photograph was admitted as State's Exhibit 16.

## II.     Loredo's First Issue

By his first issue, Loredo contends that "[t]he evidence was legally insufficient to support [his] conviction for unlawful restraint with [substantial] risk of serious bodily injury."

### A.     Standard of Review and Applicable Law

We apply the standard of review articulated by the Court of Criminal Appeals in *Baltimore v. State*:

> The Fourteenth Amendment's guarantee of due process of law prohibits a criminal defendant from being convicted of an offense and denied his liberty except upon proof sufficient to persuade a rational trier of fact beyond a reasonable doubt of every fact necessary to constitute the offense. In a criminal trial, the State carries the burden of persuading the fact-finder that the defendant is guilty of the offense beyond a reasonable doubt. Evidence supporting a conviction is legally sufficient if a rational trier of fact could have found that the defendant committed each element of the offense beyond a reasonable doubt. A "mere modicum" of evidence, however, is not sufficient to rationally support a conviction beyond a reasonable doubt. Therefore, the question considered on an evidentiary sufficiency review is not whether there was *any* evidence to support a conviction, but whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt. In this way, legal sufficiency review ensures that the State carries its burden at trial to prove each element of the offense beyond a reasonable doubt.
>
> When assessing the sufficiency of the evidence to support a criminal conviction, reviewing courts consider the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found that the State has proven the essential elements of the crime beyond a reasonable doubt. This standard gives full responsibility to the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Reviewing courts consider the cumulative force of all evidence to determine whether the evidence was sufficient to establish each element of the offense.
>
> A determination of evidentiary sufficiency is measured by the essential elements of the offense as defined by a hypothetically correct jury charge. Reviewing courts measure sufficiency by comparing the evidence produced at

7

trial to the essential elements of the offense as defined by the hypothetically correct jury charge. A hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. The law authorized by the indictment consists of the statutory elements of the offense as modified by the indictment allegations. . . .

When considering a claim of evidentiary sufficiency, reviewing courts may not substitute their judgment for that of the factfinder by re-evaluating the weight and credibility of the evidence. A jury is permitted to draw reasonable inferences from the evidence presented at trial, so long as each inference is supported by the evidence produced at trial. Juries may use common sense, common knowledge, personal experience, and observations from life when drawing those inferences. Juries are not, however, permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions.

*Baltimore v. State*, 689 S.W.3d 331, 340–42 (Tex. Crim. App. 2024) (footnotes omitted) (citations omitted).

### B.    Analysis

The jury heard sufficient evidence to conclude that Orta Arellano was unlawfully restrained and that she was exposed to a substantial risk of serious bodily injury.

Loredo asserts that Orta Arellano never specifically asked to be taken to her grandmother's house. Loredo asserts that "home" could have meant his house. The State urges that under the circumstances, the jury could have reasonably concluded that Loredo knew that Orta Arellano wanted to go to her grandmother's house. Further, the State posits that Loredo's argument about the meaning of "home" misses the broader point of that evening: Orta Arellano wanted away. We agree with the State. There was evidence from which the jury could have reasonably concluded that both Orta Arellano wanted to go to her grandmother's house and that,

8

when it became clear that Loredo was not taking her there, she wanted out of his car. The jury could have also reasonably concluded that Loredo intentionally or knowingly used unlawful physical violence in an attempt to keep Orta Arellano in his car, i.e., restrain her.

Loredo asserts that Escobar and Dr. Brown did not personally observe the exact physical mechanics by which Orta Arellano exited Loredo's vehicle and therefore their testimony about the risk of serious bodily injury from exiting a moving vehicle is speculative. We need not address that contention. The jury heard from Dr. Brown that there was physical evidence that Orta Arellano had been strangled. "[J]urors are permitted 'to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence presented to [them] in order to conclude that a particular injury constitutes "serious bodily injury."'" *Garcia v. State*, 667 S.W.3d 756, 763 (Tex. Crim. App. 2023) (quoting *Wade v. State*, 663 S.W.3d 175, 185 (Tex. Crim. App. 2022)). Likewise, the jury could have used its common sense about what presented a substantial risk of serious bodily injury. *See id.*; *Taylor v. State*, 550 S.W.2d 695, 697 (Tex. Crim. App. 1977) ("The evidence is sufficient to show that when the two young men were bound and gagged and left on the freezing floor inside the locker there was a substantial risk of serious bodily injury and they were intentionally restrained."). There was sufficient evidence for the jury to conclude that Loredo exposed Orta Arellano to a substantial risk of serious bodily injury. We overrule Loredo's first issue.

## III.     Loredo's Second Issue

By his second issue, Loredo contends that "[t]he trial court erred in not granting [his] request for the lesser-included offense of assault-bodily injury of a family member on Count

Three of the indictment (assault bodily injury of a family member impeding breath)." Loredo, however, goes on to concede that "this argument has been foreclosed by the [Texas] Court of Criminal Appeals in *Ortiz v. State,* [sic] 623 S.W.3d 804 (Tex.Crim.App.2021) [sic]."

We therefore overrule Loredo's second issue.

## IV.     Loredo's Third Issue

By his third issue, Loredo contends,

The trial court erred in its oral instruction to the jury to continue deliberations until they had a unanimous verdict as to all three counts after polling the jury and finding that one juror's guilty vote was not her verdict. This had a coercive effect on the jury's verdict of guilty as to Count Two of the indictment.

### A.     Factual Background

At 12:02 p.m. on March 21, 2024, the trial court called the court to order and asked that the jury be brought into the courtroom. The trial court asked the presiding juror if the jury had reached a verdict. The presiding juror stated that they had and that it was unanimous. The presiding juror handed the verdict form to the bailiff, who then handed it to the trial court. The trial court read the verdict: "not guilty" on kidnapping; "guilty" on the other two charges. Loredo asked that the jury be polled. Juror Two was asked: "[I]s this your individual verdict?" Juror Two answered: "No." The trial court then asked Juror Two if she had been coerced into the verdict. Juror Two answered, "No. I believe that all of us had to agree unanimously; and if not, it would be not guilty." The trial court then retired the jury and declared a recess. It was 12:05 p.m.

When court resumed at 12:14 p.m., Loredo, outside of the jury's presence, moved for a mistrial on grounds that the verdict was not unanimous. The trial court denied that motion and called the jury back in. Once the jury was seated, the trial court gave the following instruction:

> [L]adies and gentlemen of the jury, since Juror No. 2 indicated this is not her individual verdict, the Court is instructing you that you need to continue deliberations until you have a unanimous verdict as to all three counts; and it has to be each individual's individual verdict as to all three counts.

The trial court then retired the jury to resume their deliberations. It was 12:20 p.m.

Court resumed a minute later, at 12:21 p.m. The trial court called the jury back in. Once the jury was seated, the presiding juror stood and stated that the jury had reached a unanimous verdict. As before, the verdict was "not guilty" on kidnapping and "guilty" on the other two charges. This time, when polled, Juror No. 2 stated, with respect to all three counts, that the verdict was her individual verdict. All the remaining jurors did likewise. The trial court entered the verdict.

### B. Standard of Review

We review this as a matter of asserted jury-charge error.

We settle on the charge error standard of review after examining the nature of Loredo's complaint and the way he framed it on appeal. Loredo did not object when, after polling the jury, the trial court sent the jury back for further deliberations. Generally, a contemporaneous objection is required regarding the trial court's polling procedure. *Barnett v. State*, 189 S.W.3d 272, 277 (Tex. Crim. App. 2006) ("We agree with the State that appellant forfeited any error in the jury polling process by failing to object when the trial court went beyond the scope of article 37.05 and asked how each juror voted—guilty or not guilty."). However, depending on how the

11

case is presented on appeal, an appeal may survive a failure to object in the trial court. In *Barnett*, the appellant urged that his complaint concerned coercive comments to the jury by the trial court that just happened to arise during polling. *Id.* ("The complaint was improperly 'conversing' with two jurors about their willingness to change their verdict, and that conversation happened to occur during the polling of the jury. Thus, appellant did not forfeit the right to complain about the *content* of the trial court's later statements simply because he asked for the jury to be polled or because he failed to object once the trial court went beyond the proper scope of jury polling."). Therefore, though there was no objection that the trial court's polling process ran afoul of Article 37.05 of the Texas Code of Criminal Procedure, Barnett's complaint of coercion was within the scope of his after-the-fact motion for mistrial[9] and was reviewed for abuse of discretion. *Id.* at 277–78.

Loredo's complaint on appeal though, is more directly focused on the polling process than the complaint in *Barnett*. Loredo asserts on appeal that the instruction given by the trial court "exceeded its authority" under Article 37.05(a). *See* TEX. CODE CRIM. PROC. ANN. art. 37.05 (Supp.). Loredo's motion for mistrial in the trial court did not mention Article 37.05. Nor did the motion for mistrial complain of the type of comments from the bench at issue in *Barnett*. Instead, the brief oral motion merely asserted that the verdict was non-unanimous. Therefore, we do not look to *Barnett* as providing the standard of review for this case.

---

[9]The motion for mistrial in *Barnett* was made shortly after the trial court had singled out two jurors and stated: "'[W]e . . . have a problem with both of you' and ask[ed] them if they would be able to change their vote[s]." *Barnett*, 189 S.W.3d at 278. The motion for mistrial after the trial court's statements preserved error because the trial court's statement presented error that could not be cured by instruction and because Barnett "could not reasonably have foreseen that the trial court would" make those comments to the two jurors. *Id.*

Broadly speaking, the "[l]ength of time that the jury may be held for deliberation rests in the discretion of the trial judge." *Montoya v. State*, 810 S.W.2d 160, 166 (Tex. Crim. App. 1989). Loredo's assertion on appeal, while closely akin to timing, asserts something more than timing. Loredo asserts that, when instructing the jury to continue deliberations, the trial court made coercive statements that went beyond the bounds of Article 37.05. Therefore, we do not review this for abuse of discretion regarding the length of time a jury may be held for deliberations.

Loredo asserts that the circumstances here present a variety of jury-charge error. The State, in one place, asserts that Loredo's third issue is reviewable for abuse of discretion. In the main, though, the State agrees that this is reviewable as a variety of jury-charge error.

A trial court's oral statements, or lack thereof, have previously been reviewed as charge error. *Hudson v. State*, 394 S.W.3d 522, 524 n.3 (Tex. Crim. App. 2013) (considering, in the charge-error analysis, a variance between the written charge and the charge as read by the trial court to the jury); *Casanova v. State*, 383 S.W.3d 530, 541 (Tex. Crim. App. 2012) (reviewing a trial court's failure to read the charge aloud for egregious harm as unobjected charge error). We are mindful that "all alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). Therefore, rather than finding briefing waiver, or reviewing Loredo's complaint narrowly strictly as a matter of Article 37.05, we review Loredo's complaint as a variety of charge error.

"We review a claim of alleged charge error by determining whether the charge was erroneous, and if it was, we conduct a harm analysis." *Chambers v. State*, 663 S.W.3d 1, 4 (Tex.

13

Crim. App. 2022). "If the error was the subject of a timely objection, reversal is required if the error was calculated to injure the rights of the appellant, which means no more than that there must be some harm." *Reed v. State*, 680 S.W.3d 620, 625 (Tex. Crim. App. 2023). "But if there was no proper objection to the error, a reversal will be granted only if the error presents egregious harm, meaning that the appellant did not receive a fair and impartial trial." *Id.* at 625–26.

### C.    Analysis

We assume without deciding that there was error but determine that any error did not result in egregious harm.

We decline to give a "yes" or "no" answer to whether the trial court's statements complied with Article 37.05. This is because, while Loredo asserts that the trial court's instruction to continue deliberating went beyond the bounds of Article 37.05, Loredo did not object on that basis in the trial court, and on appeal, Loredo provides no citation to authority for that assertion. We do not dispose of Loredo's third issue on grounds of trial court error preservation because Loredo argues that non-compliance with Article 37.05 gave rise to charge error. No objection is needed to assert charge error on appeal. *Kirsch*, 357 S.W.3d at 649. Similarly, we do not dispose of Loredo's third issue as a matter of briefing waiver on appeal. Granted, *Barnett* requires a contemporaneous objection to an alleged violation of Article 37.05. *Barnett*, 189 S.W.3d at 277. But at the same time, *Barnett*, under the circumstances of that case, considered a coercion assertion to be not so much an Article 37.05 polling process violation as a matter that "happened to occur during the polling of the jury." *Id.* at 276. While we do not

14

decide on the basis of error preservation or briefing waiver, speaking to whether the trial court complied with Article 37.05 in the absence of citation to authority from Loredo would be a disservice to practitioners and trial courts seeking informed appellate guidance from the Article 37.05 polling process.

Hence, we review Loredo's third issue as Loredo presented it, as a matter of alleged charge error. Under that review, for reasons just discussed, we assume error and turn to harm.

Even assuming error, it is difficult to ascertain the extent of harm, if any. This is because, again, Loredo provides no citation to authority regarding what is, or is not, permissible when implementing Article 37.05.

In any event, Loredo did not object to the trial court's statements, and Loredo contends those statements constitute charge error, which means that if the trial court's statements had any coercive effect, Loredo must show that they caused him egregious harm.

The record here does not demonstrate egregious harm. The jury acquitted Loredo on the first charge he faced. The trial court did not inquire into what Juror Two's verdict was, nor did the trial court ask Juror Two to change her verdict. Juror Two stated that she was not coerced into her verdict. The jury's return in one minute is more indicative of Juror Two being unclear about what the trial court was asking her rather than Juror Two changing her vote based on the trial court's statements. The trial court's statements here are not of the sort calculated to result in specific jurors changing their votes, as was the case in *Barnett*, nor does the record here indicate that specific juror(s) changed their vote(s) following statements by the trial court, as was the case in *Barnett*. The facts here are closer to those in a recent decision of the Eastland Court of

15

Appeals. *Gonzales v. State*, 680 S.W.3d 358, 382 (Tex. App.—Eastland 2023, pet. ref'd) ("[W]e cannot conclude that the trial court improperly commented on the weight of the evidence or coerced Juror Eleven when it confirmed that the verdict was not unanimous and instructed the jury to continue deliberating until they reached a unanimous verdict.").

We overrule Loredo's third point of error.

## V.        Conclusion

We affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted:     January 17, 2025
Date Decided:       May 30, 2025

Do Not Publish

16